ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
Email: Andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, <br><br> Plaintiff, <br><br> vs. <br><br> FOREVER RESORTS, LLC, LAKE OROVILLE MARINA, LLC, BILL HARPER AND REX MAUGHAN, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the Act") against Forever Resorts, LLC,  Lake Oroville Marina, LLC, Bill Harper and Rex Maughan ("Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United

States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. §1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.      On or about May 13, 2016, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("CWA Notice Letter"), and of their intention to file suit against Defendants, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991).  Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991).  A true and correct copy of the CWA Notice Letter is attached hereto as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since Plaintiff served the CWA Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Intra-district venue is proper in Sacramento, California, because the sources of the violations are located within Butte County.

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

Case No.

## II.   **INTRODUCTION**

5.      This Complaint seeks relief for Defendants' violations of the CWA at the approximately 4-acre marina owned and/or operated by Defendants (the "Facility").  The Facility is located at 801 Bidwell Canyon Road, in Oroville, California.  Defendants discharge pollutant-contaminated storm water from the Facility into Lake Oroville.  Defendants are operating in violation of both the substantive and procedural requirements of the CWA.

6.      Defendants' discharges of pollutant-contaminated storm water from the Facility violate the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 2014-0057-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

7.      The failure on the part of industrial facility operators such as Defendants to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as Lake Oroville.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to Lake Oroville.

## III.   **PARTIES**

8.      CSPA is a non-profit public benefit corporation organized under the laws of California, with its main office in Stockton, California.  CSPA is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California waters, including the waters into which Defendants discharge polluted storm

Complaint For Declaratory and                                                            Case No.
Injunctive Relief and Civil Penalties

water.  To further its goals, CSPA actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

9.      Members of CSPA, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate on and near Lake Oroville, into which Defendants cause pollutants to be discharged.  These CSPA members use and enjoy the impacted waters for recreational, educational, scientific, conservation, aesthetic and spiritual purposes. Defendants' discharge of storm water containing pollutants impairs each of those uses. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the General Permit.

10.     Members of CSPA reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CSPA use and enjoy the waters of Lake Oroville, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CSPA use these areas to fish, sail, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

11.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

12.     Plaintiff is informed and believes, and thereupon alleges that Defendants own and/or operate the Facility.

## IV.   <u>LEGAL BACKGROUND</u>

### A.   **Clean Water Act**

13.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ."  33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

14.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

16.     A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

17.     "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters.  40 C.F.R. § 230.3 (2015).

18.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity.  *Id.* § 1342(p)(2)(B).

19.     Section 505(a)(1) provides for citizen enforcement actions against any

"person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

20.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

**B.     State Regulations**

21.     Lake Oroville is heavily degraded from pollutant loading.  This is officially recognized by the EPA, the State Board and the Regional Board, which have placed the waterbody on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards.  The Regional Board's Water Quality Control Plan for the Sacramento River and San Joaquin River Basin (hereafter referred to as the "Basin Plan") is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the region.  Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses.  The Basin Plan sets forth narrative water quality objectives for sediment, settleable and suspended materials, as well as narrative objectives for preventing the impairment of water quality with oil sheens, turbidity or other nuisance conditions.  The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objectives for certain pollutants of concern, such as zinc and aluminum.

22.     In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"), discussed further below, sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries.  The CTR applies to Lake Oroville, and includes limits for several toxic metals, including zinc.

Complaint For Declaratory and                                                                   Case No.
Injunctive Relief and Civil Penalties

### C.     California Industrial Storm Water General Permit

23.     Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

24.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

25.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

26.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI"). The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

27.     Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

28.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

29.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

Complaint For Declaratory and                                                      Case No.
Injunctive Relief and Civil Penalties

30.     Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code. Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

31.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

32.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendants: Total Suspended Solids – 100 mg/L; Zinc – 0.117 mg/L; Magnesium – 0.064 mg/L; Iron – 1.00 mg/L; Lead – 0.014 – 0.262 (hardness dependent); and, Aluminum – 0.75 mg/L.

33.     The Regional Board has established water quality standards for Lake Oroville in the Basin Plan.

34.     The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to or which produce detrimental physiological responses in, human, plant, animal, or aquatic life."  III-8.01 Basin Plan.

35.     The Basin Plan provides that "[w]aters shall not contain concentrations of chemical constituents known to be deleterious to fish or wildlife."  III-3.00 Basin Plan.

36.     The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."  *Id.*

37.     EPA issued the CTR in 2000, establishing numeric receiving water limits for certain toxic pollutants in California surface waters.  40 C.F.R. § 131.38 (2013).  The CTR establishes the following applicable numeric limit for freshwater surface waters:  zinc – 0.12 mg/L (maximum concentration), subject to water hardness.

38.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

39.     Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions.  General Permit, Section X.B.

40.     Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice. General Permit, Section X.H.2.

Complaint For Declaratory and                                                                          Case No.
Injunctive Relief and Civil Penalties

41.     Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

42.     Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

43.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

44.     The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  General Permit, Section X.I.2. Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.  Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm water discharged from the facility base on the pollutant source assessment.  General Permit, Section XI.B.6.

45.     Dischargers must submit all sampling and analytical results via SMARTS

Complaint For Declaratory and                                                                 Case No.
Injunctive Relief and Civil Penalties

within thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.

Sampling results must be compared to the two types of Numeric Action Level ("NAL")

values set forth at Table 2 of the General Permit.  General Permit, Section XII.  An annual

NAL exceedance occurs when the average of the results for a parameter for all samples

taken within a reporting year exceeds the annual NAL value.  General Permit, Section

XII.A.1.  An instantaneous NAL exceedance occurs when two (2) or more results from

samples taken for any single parameter within a reporting year exceed the instantaneous

maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has an NAL

exceedance during a reporting year, the discharger's status changes to Level 1 status under

the General Permit and the discharger must comply with the requirements set forth for Level

1 status operators set forth at Section XII.C.  The discharger's status shall change to Level 2

status if sampling results indicated an NAL exceedance for a parameter while the discharger

is in Level 1 status.  If a discharger becomes Level 2 status it must comply with the

obligations set forth at Section XII.D of the General Permit.

46.     Dischargers must submit an Annual Report no later than July 15th following

each reporting year certifying compliance with the Permit and/or an explanation for any non-

compliance.  General Permit, Section XVI.

**V.     STATEMENT OF FACTS**

47.     The Facility is classified as conforming to Standard Industrial Classification

("SIC") Code 4493 ("Marinas").  Industrial activities occur throughout the Facility.  CSPA's

investigation into the industrial activities at Defendants' approximately 4-acre facility

indicates that the Facility is used to repair and store boats.  Moreover, the Facility is used, or

has been used in the past, for equipment storage, boat painting and restoring, boat fueling

and boat waste removal.

48.     Most of these activities occur outside in areas that are exposed to storm water

and storm flows due to the lack of overhead coverage, functional berms and other storm

water controls.  Plaintiff is informed and believes that Defendants' storm water controls, to

the extent any exist, fail to achieve BAT and BCT standards.

Complaint For Declaratory and                                                                    Case No.
Injunctive Relief and Civil Penalties

11

49.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards.  The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants, thereby allowing storm water to flow over and across these materials and become contaminated prior to leaving the Facility.  In addition, the Facility lacks structural controls to prevent the discharge of water once contaminated.  The Facility also lacks an adequate filtration system to treat water once it is contaminated.

50.     During rain events, storm water laden with pollutants discharges from the Facility to Lake Oroville.

51.     Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during significant rain events.

52.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.

53.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

54.     Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

55.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that Defendants have not sampled with adequate frequency, has not conducted visual monitoring, and has not analyzed the storm water samples collected at the Facility for the required pollutant parameters.

Complaint For Declaratory and                                                                    Case No.
Injunctive Relief and Civil Penalties

56.     Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Discharges of Contaminated Storm Water From The Facility
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

57.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

58.     Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

59.     Plaintiff is informed and believes, and thereupon alleges, that since at least May 13, 2011, Defendants have been discharging polluted storm water from the Facility into Lake Oroville in violation of the General Permit.

60.     During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility into Lake Oroville.

61.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition III.C of the General Permit.

62.     Plaintiff is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General Permit.

63.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to violations of applicable water quality

standards in the Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in violation of Receiving Water Limitation VI.A of the General Permit.

64.     Plaintiff is informed and believes, and thereupon alleges, that every day since May 11, 2011, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit. These violations are ongoing and continuous.

65.     Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since May 13, 2011.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

**SECOND CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Storm Water Pollution Prevention Plan For the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

66.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

67.     Section X of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

68.     Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials without appropriate best management practices; the continued exposure of significant quantities of industrial materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

69.     Defendants have further failed to update the Facility's SWPPP in response to

the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b.  Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

70.     Each day that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since May 13, 2011.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

### THIRD CLAIM FOR RELIEF
**Failure to Develop and Implement the Best Available
And Best Conventional Treatment Technologies at the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

71.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

72.     The General Permit's SWPPP requirements and Effluent Limitation D.32 require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

73.     Defendants have failed to implement BAT and BCT at the Facility for their discharges of TSS, zinc, aluminum, iron, and magnesium in violation of Effluent Limitation D.32 of the General Permit.

74.     Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

75.     Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

76.     Defendants have been in violation of the BAT and BCT requirements at the

Facility every day since at least May 13, 2011.  Defendants are subject to civil penalties for each and every violation of the Act since May 13, 2011.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

### FOURTH CLAIM FOR RELIEF
### Failure to Develop and Implement an Adequate
### Monitoring Implementation Plan for the Facility
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

77.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

78.    Section X.I and Section XI. of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

79.    Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facility.  Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their continuing failure to collect and analyze storm water samples from all discharge locations, their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants, including Total Suspended Solids – 100 mg/L, Aluminum – 0.75 mg/L, Zinc – 0.117 mg/L, Iron – 1.00 mg/L, Magnesium – 0.064 mg/L, as the General Permit requires, and its failure to file required Annual Reports with the Regional Board which provide required documentation and information relating to visual observations and storm water sampling and analysis conducted at the Facility.

80.    Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in each day since at least May 13, 2011.  These violations are ongoing and continuous.

81.    Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil

penalties for each and every violation of the Act since May 13, 2011.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## VII.    RELIEF REQUESTED

Wherefore, CSPA respectfully requests that this Court grant the following relief:

a.   Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and procedural requirements of the General Permit and the CWA as alleged herein;

b.   Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility in violation of the Act and the General Permit;

c.   Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendants to pay civil penalties of $37,500 per day per violation for all violations occurring after May 13, 2011, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4 (2008);

e.   Order Defendants to take appropriate actions to restore the quality of navigable waters impaired by their activities;

f.   Award Plaintiff's costs and fees (including reasonable attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

g.   Award any such other and further relief as this Court may deem appropriate.

Dated: July 12, 2016                              Respectfully Submitted,

                                                             LAW OFFICES OF ANDREW L. PACKARD

                                             By:     /s/ Andrew L. Packard

                                                             Andrew L. Packard
                                                             Attorneys for Plaintiff
                                                             CALIFORNIA SPORTFISHING
                                                             PROTECTION ALLIANCE

Complaint For Declaratory and                                                         Case No.
Injunctive Relief and Civil Penalties

**EXHIBIT A**

Law Offices Of

ANDREW L. PACKARD

100 Petaluma Blvd N, Ste 301, Petaluma, CA 94952
Phone (707) 763-7227   Fax (707) 763-9227
Info@PackardLawOffices.com

May 11, 2016

**VIA CERTIFIED MAIL**

Bill Harper, General Manager          Bill Harper, General Manager
Lake Oroville Marina, LLC             Bidwell Canyon Marina
801 Bidwell Canyon Road               801 Bidwell Canyon Road
Oroville, California 95966            Oroville, California 95966

Matt Harvey, Agent for Service of Process   Rex Maughan, President
Lake Oroville Marina, LLC                    Forever Resorts, LLC
7501 E. McCormick Parkway #1100LL            7501 E. McCormick Parkway
Scottsdale, Arizona 85258                    Scottsdale, Arizona 85258

Re:   **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE**
      **FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT")**
      **(33 U.S.C. §§ 1251 *et seq.*)**

Dear Mr. Harper and Mr. Maughan:

     This firm represents the California Sportfishing Protection Alliance ("CSPA"), a
California non-profit association, in regard to violations of the Clean Water Act ("CWA" or "the
Act") occurring at Bidwell Canyon Marina ("BCM"), located at 801 Bidwell Canyon Road, in
Oroville, California (the "Facility").  This letter is being sent to you as the responsible owners,
officers and/or operators of the Facility.  Unless otherwise noted, Mr. Harper, Mr. Maughan,
Bidwell Canyon Marina, and Lake Oroville Marina, LLC shall hereinafter be collectively
referred to as "BCM."  CSPA is dedicated to the preservation, protection and defense of the
environment, wildlife and natural resources of California waters, including the waters into which
BCM discharges polluted storm water.

     BCM is in ongoing violation of the substantive and procedural requirements of the CWA,
33 U.S.C. § 1251 *et seq.* and California's General Industrial Storm Water Permit, National
Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 ("General
Permit"), Water Quality Order No. 97-03-DWQ ("1997 General Permit"), as superseded by
Order No. 2015-0057-DWQ ("2015 General Permit").[1]

---

[1] BCM submitted a Notice of Intent (NOI) to comply with the General Permit for the
Facility on or about January 26, 2015.

Notice of Violation and Intent To File Suit
May 11, 2016
Page 2 of 12

On July 1, 2015, the 2015 General Permit went into effect, superseding the 1997 General Permit that was operative between 1997 and June 30, 2015. The 2015 General Permit includes many of the same fundamental requirements and implements many of the same statutory requirements as the 1997 General Permit. Violation of both the 1997 and 2015 General Permit provisions is enforceable under the law. 2015 General Permit, Finding A.6.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Bidwell Canyon Marina to a penalty of up to $37,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. § 1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The CWA requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2.

As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility.  40 C.F.R. § 135.3(a).  At the expiration of sixty (60) days from the date of this letter, CSPA intends to file suit under Section 505(a) of the Act in federal court against BCM for violations of the Act and the Permit.

I.      **Background.**

        **A.   The Clean Water Act.**

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute.  33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002).  The Act is administered largely through the NPDES permit program.  33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system.  Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme).  The discharge of pollutants without an NPDES permit, or in violation of an NPDES permit, is illegal.  *Ecological Rights Found. v. Pac. Lumber Co*., 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states.  *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing

Case 2:16-cv-01595-MCE-EFB Document 1 Filed 07/12/16 Page 21 of 33
Notice of Violation and Intent To File Suit
May 11, 2016
Page 3 of 12

California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers, as well as through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342.

**B. California's General Permit for Storm Water Discharges Associated with Industrial Activities**

Between 1997 and June 30, 2015, the General Permit in effect was Order No. 97-03-DWQ, which CSPA refers to as the "1997 General Permit." On July 1, 2015, pursuant to Order No. 2015-0057-DWQ the General Permit was reissued, including many of the same fundamental terms as the prior permit. For purposes of this notice letter, CSPA refers to the reissued permit as the "2015 General Permit." The 2015 General Permit rescinded in whole the 1997 General Permit, except for the expired permit's requirement that annual reports be submitted by July 1, 2015, and for purposes of CWA enforcement. 2015 General Permit, Finding A.6.

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). 1997 General Permit, Provision E.1; 2015 General Permit, Standard Condition XXI.A. Facilities must file their NOIs before the initiation of industrial operations. *Id.*

Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

**C. BCM's Lake Oroville Facility**

BCM's approximately 4-acre Facility is operated as a marina as well as a boat and maintenance shop. The industrial activities at the Facility fall under Standard Industrial Classification ("SIC") Code 4493 ("Marinas").

BCM collects and discharges storm water associated with industrial activities at the Facility through at least two (2) discharge points into Lake Oroville. Lake Oroville is a water of the United States within the meaning of the Clean Water Act.

The General Permit requires BCM to analyze storm water samples for Total Suspended Solids ("TSS"), pH, and Oil and Grease ("O&G"). 1997 General Permit, Section B.5.c.i; 2015 General Permit, Section XI.B.6. Facilities under SIC Code 4493 must also analyze storm water

Case 2:16-cv-01595-MCE-EFB   Document 1   Filed 07/12/16   Page 22 of 33
Notice of Violation and Intent To File Suit
May 11, 2016
Page 4 of 12

samples for Aluminum ("Al"), Iron ("Fe"), Lead ("Pb"), and Zinc ("Zn").  1997 General Permit, Tables 1-2; 2015 General Permit, Tables 1-2.

## II.   BCM's Violations of the Act and Permit.

Based on its review of available public documents, CSPA is informed and believes that BCM is in ongoing violation of both the substantive and procedural requirements of the CWA and the Permit.  BCM's violations are ongoing and continuous.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the CWA, BCM is subject to penalties for violations of the Act since May 11, 2011.

### A.  BCM Discharges Storm Water Containing Pollutants in Violation of the Permit's Discharge Prohibitions, Receiving Water Limitations and Effluent Limitations.

BCM's storm water sampling results provide conclusive evidence of BCM's failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

### 1.  Applicable Water Quality Standards.

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  1997 General Permit, Discharge Prohibition A.2; 2015 General Permit, Discharge Prohibition III.C. The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies.  1997 General Permit, Receiving Water Limitation C.2; 2015 General Permit, Discharge Prohibition III.D.  Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  1997 General Permit, Receiving Water Limitations C.1, C.2; 2015 General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations.  1997 General Permit, p. VII; 2015 General Permit, Special Condition XX.B.  The documentation must describe changes the discharger will make to its current storm water best management practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  *Id.*

The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, violation of which is a violation of Permit conditions.  *Cal. Sportfishing Prot. Alliance v.*

Notice of Violation and Intent To File Suit
May 11, 2016
Page 5 of 12

*Chico Scrap Metal, Inc.,* 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015).  CTR establishes numeric receiving water limits for toxic pollutants in California surface waters.  40 C.F.R. § 131.38.  The CTR establishes a numeric limit for at least two of the pollutants discharged by BCM:  Zinc – 0.12 mg/L (maximum concentration) and Lead – 0.065 mg/L (maximum concentration).

The *Water Quality Control Plan, Fourth Edition (Revised August 2006), for the Sacramento and San Joaquin River Basins* ("Basin Plan") also sets forth water quality standards and prohibitions applicable to BCM's storm water discharges.  The Basin Plan identifies present and potential beneficial uses for the Sacramento River, which include municipal and domestic water supply, hydropower generation, agricultural supply, industrial service supply, navigation, wildlife habitat, warm freshwater habitat, cold freshwater habitat, warm and cold spawning, and contact and non-contact water recreation.

## 2.  Applicable Effluent Limitations.

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A.  Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform.  40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional.  40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  *Santa Monica Baykeeper v. Kramer Metals,* 619 F.Supp.2d 914, 920, 923 (C.D. Cal 2009); 1997 General Permit, Effluent Limitations B.5-6; 2015 General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by BCM: Total Suspended Solids – 100 mg/L; Zinc – 0.117 mg/L; Aluminum – 0.75 mg/L; Chemical Oxygen Demand – 120 mg/L; Iron – 1.0 mg/L; Magnesium – 0.0636 mg/L; Lead – 0.0816 mg/L; and Oil & Grease – 15.0 mg/L.

## 3.  Bidwell Canyon Marina's Storm Water Sample Results

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations and effluent limitations of the Permit:

   a.   **Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value**

Notice of Violation and Intent To File Suit
May 11, 2016
Page 6 of 12

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|------|-----------------|-----------|-----------------------------------|----------------------------|
| 12/3/2015 | South Runoff | TSS | 106 | 100 |
| 4/5/2015 | North Runoff | TSS | 128 | 100 |
| 4/5/2015 | South Runoff | TSS | 491 | 100 |
| 1/29/2014 | South Runoff | TSS | 444 | 100 |
| 10/05/2011 | Shop | TSS | 344 | 100 |

**b.     Discharges of Storm Water Containing Zinc (Zn) at Concentrations in Excess of Applicable EPA Benchmark and CTR Values**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) | CTR Criteria (mg/L) |
|------|-----------------|-----------|-----------------------------------|----------------------------|---------------------|
| 3/20/16 | South Runoff | Zn | 0.148 | 0.117 | 0.12 |
| 3/10/2016 | South Runoff | Zn | 0.163 | 0.117 | 0.12 |
| 12/3/2015 | South Runoff | Zn | 0.179 | 0.117 | 0.12 |
| 4/5/2015 | South Runoff | Zn | 0.69 | 0.117 | 0.12 |
| 3/26/2014 | South Runoff | Zn | 0.36 | 0.117 | 0.12 |
| 1/29/2014 | South Runoff | Zn | 1.42 | 0.117 | 0.12 |
| 2/19/2013 | North Runoff | Zn | 0.27 | 0.117 | 0.12 |
| 1/19/2012 | Shop Runoff | Zn | 1.51 | 0.117 | 0.12 |
| 1/19/2012 | South Runoff | Zn | 0.20 | 0.117 | 0.12 |
| 10/05/2011 | Shop | Zn | 1.02 | 0.117 | 0.12 |

**c.     Discharges of Storm Water Containing Aluminum (Al) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|------|-----------------|-----------|-----------------------------------|----------------------------|
| 3/20/2016 | South Runoff | Al | 2.87 | 0.75 |
| 3/10/2016 | South Runoff | Al | 1.46 | 0.75 |
| 12/9/2015 | South Runoff | Al | 1.68 | 0.75 |
| 12/3/2015 | South Runoff | Al | 2.25 | 0.75 |
| 4/5/2015 | North Runoff | Al | 1.2 | 0.75 |
| 4/5/2015 | South Runoff | Al | 8.7 | 0.75 |
| 3/26/2014 | North Runoff | Al | 1.1 | 0.75 |
| 3/26/2014 | South Runoff | Al | 6.1 | 0.75 |
| 1/29/2014 | North Runoff | Al | 1.6 | 0.75 |
| 1/29/2014 | South Runoff | Al | 11.3 | 0.75 |
| 2/19/2013 | North Runoff | Al | 2.1 | 0.75 |
| 1/19/2012 | Shop Runoff | Al | 3.9 | 0.75 |

Notice of Violation and Intent To File Suit
May 11, 2016
Page 7 of 12

| 1/19/2012 | South Runoff | Al | 1.1 | 0.75 |
| 10/05/2011 | Shop | Al | 12.5 | 0.75 |
| 10/05/2011 | South Runoff | Al | 3.1 | 0.75 |

**d.** **Discharges of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 3/20/2016 | South Runoff | Fe | 4.02 | 1.0 |
| 3/10/2016 | South Runoff | Fe | 2.16 | 1.0 |
| 12/9/2015 | South Runoff | Fe | 2.93 | 1.0 |
| 12/3/2015 | South Runoff | Fe | 3.82 | 1.0 |
| 4/5/2015 | North Runoff | Fe | 2.27 | 1.0 |
| 4/5/2015 | South Runoff | Fe | 10.8 | 1.0 |
| 3/26/2014 | North Runoff | Fe | 1.59 | 1.0 |
| 3/26/2014 | South Runoff | Fe | 8.76 | 1.0 |
| 1/29/2014 | North Runoff | Fe | 2.68 | 1.0 |
| 1/29/2014 | South Runoff | Fe | 14.8 | 1.0 |
| 2/19/2013 | North Runoff | Fe | 2.27 | 1.0 |
| 1/19/2012 | Shop Runoff | Fe | 4.39 | 1.0 |
| 1/19/2012 | South Runoff | Fe | 1.63 | 1.0 |
| 10/05/2011 | Shop | Fe | 18.4 | 1.0 |
| 10/05/2011 | South Runoff | Fe | 3.96 | 1.0 |

**d.** **Discharges of Storm Water Containing Magnesium (Mg) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 3/20/16 | South Runoff | Mg | 1.56 | 0.0636 |
| 12/9/2015 | South Runoff | Mg | 1.3 | 0.0636 |
| 12/3/15 | South Runoff | Mg | 1.72 | 0.0636 |

**e.** **Discharges of Storm Water Exceeding the Basin Plan Standards for pH**

| Date | Discharge Point | Parameter | Concentration in Discharge (pH units) | Basin Plan (pH units) |
|---|---|---|---|---|
| 4/5/2015 | North Runoff | pH | 4.7 | 6.5 – 8.5 |
| 4/5/2015 | South Runoff | pH | 5.7 | 6.5 – 8.5 |
| 3/26/2014 | North Runoff | pH | 6.1 | 6.5 – 8.5 |
| 1/29/2014 | North Runoff | pH | 5.8 | 6.5 – 8.5 |
| 1/29/2014 | South Runoff | pH | 5.7 | 6.5 – 8.5 |

Case 2:16-cv-01595-MCE-EFB   Document 1   Filed 07/12/16   Page 26 of 33
Notice of Violation and Intent To File Suit
May 11, 2016
Page 8 of 12

| 2/19/2013 | South Runoff | pH | 6.3 | $6.5 - 8.5$ |
|---|---|---|---|---|
| 1/19/2012 | Shop Runoff | pH | 6.0 | $6.5 - 8.5$ |
| 1/19/2012 | South Runoff | pH | 5.5 | $6.5 - 8.5$ |

### f.    BCM's Sample Results Are Evidence of Violations of the General Permit

BCM's sample results demonstrate violations of the General Permit's discharge prohibitions, receiving water limitations and effluent limitations set forth above.  CSPA is informed and believes that BCM has known that its storm water contains pollutants at levels exceeding General Permit standards since at least May 9, 2011.

CSPA alleges that such violations occur each time storm water discharges from the Facility.  Attachment A hereto, sets forth the specific rain dates on which CSPA alleges that BCM has discharged storm water containing impermissible levels of TSS, Zn, Al, Fe, and Mg in violation of the General Permit.  1997 General Permit, Discharge Prohibition A.2, Receiving Water Limitations C.1 and C.2; 2015 General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

### 4.    BCM Has Failed to Implement BAT and BCT.

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges.  1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A.  To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges.  *See* 1997 General Permit, Sections A.8.a-b; 2015 General Permit, Sections X.H.1-2.

BCM has failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping.  1997 General Permit, Sections A.8.a(i–x); 2015 General Permit, Sections X.H.1(a–g).

BCM has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations.  1997 General Permit, Section A.8.b; 2015 General Permit, Sections X.H.2.

Each day the Owners/Operators have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA (33 U.S.C. § 1311(a)).  The violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit.

Accordingly, the Owners/Operators have been in violation of the BAT and BCT requirements at the Facility every day since at least May 11, 2011.

### 5.    BCM Has Failed to Implement an Adequate Monitoring Implementation Plan.

The General Permit requires dischargers to implement a Monitoring Implementation Plan.  Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  Permit, Section X.I.2.  Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.

Dischargers must collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 1 of the General Permit, and other pollutants likely to be in the storm water discharged from the facility based on the pollutant source assessment.  Permit, Section XI.B.6.  The General Permit requires that the Discharger shall ensure that all laboratory analyses are conducted according to test procedures under 40 CFR 136.  Permit, Section XI.B.10.  Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.

BCM has failed to develop and implement an adequate Monitoring Implementation Plan by failing to sample all discharge locations during each qualifying storm event and using incorrect test methods when analyzing certain parameters.

Each day that BCM has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and Permit.  BCM has been in violation of the Monitoring Implementation Plan requirements every day since at least May 13, 2011.

### 6.    BCM Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.

The General Permit requires dischargers to develop and implement a site-specific SWPPP. 1997 General Permit, Section A.1; 2015 General Permit, Section X.A.  The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.  *See id.*

Case 2:16-cv-01595-MCE-EFB   Document 1   Filed 07/12/16   Page 28 of 33
Notice of Violation and Intent To File Suit
May 11, 2016
Page 10 of 12

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year.  2015 General Permit, Section X.B; see also 1997 General permit, Section A.

CSPA's investigation indicates that BCM has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements.  BCM has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous effluent limitation violations.

Each day BCM has failed to develop and implement an adequate SWPPP is a violation of the General Permit.  The SWPPP violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit.  BCM has been in violation of these requirements at the Facility every day since at least May 11, 2011.

**III.     Persons Responsible for the Violations.**

CSPA puts BCM on notice that they are the persons and entities responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts BCM on formal notice that it intends to include those persons in this action.

**IV.     Name and Address of Noticing Parties.**

The name, address and telephone number of each of the noticing parties is as follows:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainier Avenue
Stockton, CA 95204
(209) 464-5067

**V.     Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Case 2:16-cv-01595-MCE-EFB   Document 1   Filed 07/12/16   Page 29 of 33
Notice of Violation and Intent To File Suit
May 11, 2016
Page 11 of 12

Andrew L. Packard
Megan E. Truxillo
William N. Carlon
Law Offices Of Andrew L. Packard
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
(707) 763-7227
Andrew@PackardLawOffices.com

## VI.    Conclusion

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the CWA against Bidwell Canyon Marina and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next twenty (20) days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,


_____
Andrew L. Packard
Law Offices of Andrew L. Packard
Counsel for California Sportfishing Protection Alliance

Notice of Violation and Intent To File Suit
May 11, 2016
Page 12 of 12

## SERVICE LIST

## VIA CERTIFIED MAIL

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld, Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, CA, 94105

Hon. Loretta Lynch
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Thomas Howard, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Pamela Creedon, Executive Officer
Central Valley Regional Water Quality Control Board
11020 Sun Center Drive, Suite 200
Rancho Cordova, CA 95670

ATTACHMENT A
**Notice of Intent to File Suit, BCM**
**Significant Rain Events,* May 11, 2011 – May 11, 2016**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| May | 15 | 2011 | March | 18 | 2012 | December | 26 | 2012 |
| May | 16 | 2011 | March | 19 | 2012 | January | 5 | 2013 |
| May | 17 | 2011 | March | 25 | 2012 | January | 6 | 2013 |
| May | 18 | 2011 | March | 26 | 2012 | January | 9 | 2013 |
| May | 23 | 2011 | March | 28 | 2012 | January | 10 | 2013 |
| May | 26 | 2011 | March | 30 | 2012 | January | 23 | 2013 |
| May | 29 | 2011 | April | 1 | 2012 | January | 24 | 2013 |
| June | 1 | 2011 | April | 4 | 2012 | January | 27 | 2013 |
| June | 2 | 2011 | April | 11 | 2012 | February | 7 | 2013 |
| June | 4 | 2011 | April | 12 | 2012 | February | 8 | 2013 |
| June | 5 | 2011 | April | 13 | 2012 | February | 19 | 2013 |
| June | 6 | 2011 | April | 14 | 2012 | February | 20 | 2013 |
| June | 7 | 2011 | April | 26 | 2012 | March | 3 | 2013 |
| June | 29 | 2011 | June | 5 | 2012 | March | 4 | 2013 |
| October | 4 | 2011 | October | 22 | 2012 | March | 5 | 2013 |
| October | 5 | 2011 | October | 23 | 2012 | March | 6 | 2013 |
| October | 6 | 2011 | October | 24 | 2012 | March | 7 | 2013 |
| October | 7 | 2011 | November | 1 | 2012 | March | 19 | 2013 |
| October | 10 | 2011 | November | 17 | 2012 | March | 20 | 2013 |
| October | 11 | 2011 | November | 18 | 2012 | March | 21 | 2013 |
| November | 4 | 2011 | November | 20 | 2012 | March | 30 | 2013 |
| November | 6 | 2011 | November | 21 | 2012 | March | 31 | 2013 |
| November | 12 | 2011 | November | 28 | 2012 | April | 1 | 2013 |
| November | 20 | 2011 | November | 29 | 2012 | April | 4 | 2013 |
| November | 21 | 2011 | November | 30 | 2012 | April | 5 | 2013 |
| November | 24 | 2011 | December | 1 | 2012 | April | 7 | 2013 |
| November | 25 | 2011 | December | 2 | 2012 | April | 8 | 2013 |
| December | 15 | 2011 | December | 3 | 2012 | May | 5 | 2013 |
| January | 20 | 2012 | December | 4 | 2012 | May | 6 | 2013 |
| January | 21 | 2012 | December | 5 | 2012 | May | 7 | 2013 |
| January | 23 | 2012 | December | 6 | 2012 | May | 16 | 2013 |
| January | 24 | 2012 | December | 11 | 2012 | May | 27 | 2013 |
| January | 27 | 2012 | December | 12 | 2012 | May | 28 | 2013 |
| February | 8 | 2012 | December | 13 | 2012 | June | 10 | 2013 |
| February | 11 | 2012 | December | 16 | 2012 | June | 11 | 2013 |
| February | 13 | 2012 | December | 17 | 2012 | June | 18 | 2013 |
| February | 29 | 2012 | December | 20 | 2012 | June | 24 | 2013 |
| March | 13 | 2012 | December | 21 | 2012 | June | 25 | 2013 |
| March | 14 | 2012 | December | 22 | 2012 | June | 26 | 2013 |
| March | 15 | 2012 | December | 23 | 2012 | August | 20 | 2013 |
| March | 16 | 2012 | December | 24 | 2012 | September | 21 | 2013 |
| March | 17 | 2012 | December | 25 | 2012 | September | 22 | 2013 |
| September | 24 | 2013 | August | 5 | 2014 | February | 6 | 2015 |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, BCM**
**Significant Rain Events,* May 11, 2011 – May 11, 2016**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| October | 27 | 2013 | September | 24 | 2014 | February | 7 | 2015 |
| October | 28 | 2013 | September | 25 | 2014 | February | 8 | 2015 |
| November | 19 | 2013 | September | 26 | 2014 | February | 9 | 2015 |
| November | 20 | 2013 | October | 14 | 2014 | February | 10 | 2015 |
| November | 21 | 2013 | October | 15 | 2014 | February | 27 | 2015 |
| December | 6 | 2013 | October | 16 | 2014 | February | 28 | 2015 |
| December | 7 | 2013 | October | 20 | 2014 | March | 11 | 2015 |
| January | 29 | 2014 | October | 21 | 2014 | March | 22 | 2015 |
| January | 30 | 2014 | October | 24 | 2014 | March | 23 | 2015 |
| February | 5 | 2014 | October | 25 | 2014 | April | 5 | 2015 |
| February | 6 | 2014 | October | 26 | 2014 | April | 6 | 2015 |
| February | 7 | 2014 | October | 31 | 2014 | April | 7 | 2015 |
| February | 8 | 2014 | November | 1 | 2014 | April | 8 | 2015 |
| February | 9 | 2014 | November | 12 | 2014 | April | 23 | 2015 |
| February | 10 | 2014 | November | 13 | 2014 | April | 24 | 2015 |
| February | 16 | 2014 | November | 14 | 2014 | April | 25 | 2015 |
| February | 26 | 2014 | November | 19 | 2014 | June | 6 | 2015 |
| February | 27 | 2014 | November | 20 | 2014 | June | 7 | 2015 |
| February | 28 | 2014 | November | 21 | 2014 | July | 8 | 2015 |
| March | 1 | 2014 | November | 22 | 2014 | July | 9 | 2015 |
| March | 2 | 2014 | November | 28 | 2014 | September | 16 | 2015 |
| March | 3 | 2014 | November | 29 | 2014 | September | 17 | 2015 |
| March | 4 | 2014 | November | 30 | 2014 | October | 16 | 2015 |
| March | 5 | 2014 | December | 1 | 2014 | October | 17 | 2015 |
| March | 6 | 2014 | December | 2 | 2014 | November | 2 | 2015 |
| March | 9 | 2014 | December | 3 | 2014 | November | 3 | 2015 |
| March | 10 | 2014 | December | 4 | 2014 | November | 9 | 2015 |
| March | 25 | 2014 | December | 5 | 2014 | November | 10 | 2015 |
| March | 26 | 2014 | December | 6 | 2014 | November | 14 | 2015 |
| March | 27 | 2014 | December | 10 | 2014 | November | 15 | 2015 |
| March | 28 | 2014 | December | 11 | 2014 | November | 16 | 2015 |
| March | 29 | 2014 | December | 12 | 2014 | November | 25 | 2015 |
| March | 30 | 2014 | December | 13 | 2014 | December | 3 | 2015 |
| March | 31 | 2014 | December | 14 | 2014 | December | 4 | 2015 |
| April | 1 | 2014 | December | 15 | 2014 | December | 5 | 2015 |
| April | 5 | 2014 | December | 16 | 2014 | December | 6 | 2015 |
| April | 25 | 2014 | December | 17 | 2014 | December | 9 | 2015 |
| April | 26 | 2014 | December | 18 | 2014 | December | 10 | 2015 |
| May | 5 | 2014 | December | 19 | 2014 | December | 11 | 2015 |
| May | 6 | 2014 | December | 20 | 2014 | December | 13 | 2015 |
| August | 4 | 2014 | December | 21 | 2014 | December | 14 | 2015 |
| December | 19 | 2015 | March | 21 | 2016 | December | 21 | 2015 |
| December | 20 | 2015 | March | 22 | 2016 | December | 22 | 2015 |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, BCM**
**Significant Rain Events,* May 11, 2011 – May 11, 2016**

| | | | | | |
|---|---|---|---|---|---|
| January | 4 | 2016 | April | 23 | 2016 |
| January | 5 | 2016 | | | |
| January | 6 | 2016 | | | |
| January | 7 | 2016 | | | |
| January | 8 | 2016 | | | |
| January | 9 | 2016 | | | |
| January | 10 | 2016 | | | |
| January | 12 | 2016 | | | |
| January | 13 | 2016 | | | |
| January | 14 | 2016 | | | |
| January | 15 | 2016 | | | |
| January | 16 | 2016 | | | |
| January | 17 | 2016 | | | |
| January | 18 | 2016 | | | |
| January | 19 | 2016 | | | |
| January | 20 | 2016 | | | |
| January | 22 | 2016 | | | |
| January | 23 | 2016 | | | |
| January | 28 | 2016 | | | |
| January | 29 | 2016 | | | |
| January | 30 | 2016 | | | |
| February | 2 | 2016 | | | |
| February | 17 | 2016 | | | |
| February | 18 | 2016 | | | |
| February | 19 | 2016 | | | |
| February | 20 | 2016 | | | |
| March | 3 | 2016 | | | |
| March | 4 | 2016 | | | |
| March | 5 | 2016 | | | |
| March | 6 | 2016 | | | |
| March | 7 | 2016 | | | |
| March | 8 | 2016 | | | |
| March | 10 | 2016 | | | |
| March | 11 | 2016 | | | |
| March | 12 | 2016 | | | |
| March | 13 | 2016 | | | |
| March | 14 | 2016 | | | |
| March | 20 | 2016 | | | |
| April | 14 | 2016 | | | |
| April | 22 | 2016 | | | |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.